# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Laurie Valenta,                          :
                    Petitioner           :
                                         :   No. 1302 C.D. 2016
          v.                             :
                                         :   Submitted: September 13, 2017
Workers' Compensation Appeal             :
Board (Abington Manor Nursing            :
Home and Rehab and Liberty               :
Insurance Company),                      :
                    Respondents          :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE JOSEPH M. COSGROVE, Judge


OPINION BY
JUDGE McCULLOUGH                              FILED:  December 7, 2017


Laurie Valenta (Claimant) petitions for review of the July 1, 2016 order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) modifying wage loss benefits paid to Claimant by Abington Manor Nursing Home and Rehab (Employer) and Liberty Insurance Corporation (Insurer).

## Facts and Procedural History

Claimant had been receiving total disability benefits pursuant to the Workers' Compensation Act (Act)[1] for a work injury sustained on October 2, 2010, in which a prior WCJ, by decision circulated September 27, 2012, found she had aggravated a pre-existing calcific tendinitis with chronic tendinopathy of the left shoulder, and sustained disc herniations at C5-C6 and C6-C7 with radiculopathy, a left trapezial strain, left medial scapular strain, and a left posterior shoulder strain. (WCJ's Finding of Fact No. 2.)

On January 2, 2014, Insurer commissioned a labor market survey and earning power assessment (LMS/EPA) pursuant to section 306(b) of the Act.[2] (Reproduced Record (R.R.) at 342a.) The LMS/EPA listed six jobs with weekly pay ranging from $320.00 to $420.00. (R.R. at 297a-319a.)

Employer filed a modification petition seeking to reduce Claimant's wage loss benefits because of an alleged earning capacity. Claimant filed a timely answer denying all material allegations.

In a deposition taken on September 15, 2014, Employer submitted the medical testimony of Eugene Chiavacci, M.D. Board-certified in orthopedic surgery, Dr. Chiavacci testified that he examined Claimant twice on behalf of Employer, on March 29, 2011, and October 1, 2013. Dr. Chiavacci obtained a history of Claimant's work injury and surgery, and he testified that he reviewed records, reports, and studies concerning Claimant's treatment since the work injury. Among the records he reviewed was an x-ray of August 19, 2011, which he stated demonstrated a stable

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4; 2501-2708.

[2] Act of June 2, 1915, P.L. 736, *as amended*, added by the Act of June 24, 1996, P.L. 350, 77 P.S. §512.

cervical fusion. After performing a physical examination on Claimant at the 2013 examination, he testified that he believed she was capable of standing between one and three hours at a time; sitting five to eight hours at a time; alternating sitting and standing between five and eight hours at a time; walking one to three hours at a time; driving one to three hours at a time; and occasionally bending, squatting, climbing stairs, reaching up, kneeling, crawling, and frequently using her feet for foot controls. He testified that he did not believe Claimant could climb ladders, but that she had no restrictions as to grasping or fine manipulation. He stated that Claimant could occasionally lift up to twenty pounds and more frequently lift lesser weights. (WCJ's Findings of Fact Nos. 7-8.)

Employer also submitted the testimony of Robert Smith, the author of the LMS/EPA. Mr. Smith testified that he had been a rehabilitation specialist since 1989 and that he had been approved pursuant to the applicable regulations[3] to conduct interviews for earning power under section 306(b) of the Act. Mr. Smith testified that he coordinated an initial interview with Claimant and identified reports from Dr. Chiavacci indicating that Claimant was capable of returning to sedentary to light-duty work. He noted Claimant's educational background, which included a high school diploma and some course work at Keystone Community College. He stated that Claimant also had training to become a licensed practical nurse (LPN), and once qualified as an LPN, she worked as a charge nurse and a private duty LPN. He testified that he performed a transferable skills analysis and calculated that work as an LPN would be a medium-duty position, and that with Claimant's background, she was capable of working in a semi-skilled to skilled area. Mr. Smith then identified six positions he believed were appropriate for Claimant. (WCJ's Finding of Fact No. 9.)

---

[3] 34 Pa. Code §§123.201-123.205.

The first was a position at A. Rifkin as a customer service representative, which had light duties and lifting up to 20 pounds rarely, along with periods of sitting. This was a full-time position paying between $10.00 and $13.00 per hour and an ideal candidate would have three years of customer service experience, communication and organization skills, multi-tasking ability, attention to detail, and computer and typing skills.

The second was a full-time position at Telerex as an account representative, paying $9.00 per hour, which required a high school diploma and familiarity with computer programs. Helpful but not required was some customer service experience and an ability to type 35 words per minute.

The third was a full-time position at Navient as a customer service specialist, which paid $11.00 per hour. The job was sedentary in nature and required one year of customer service experience. A college degree was preferred but not required, along with good communication, analytical, and computer skills.

The fourth was a full-time position at Bank of America as a customer service associate, paying $10.50 per hour. The job was sedentary in nature, with prolonged sitting, and required no lifting above 10 pounds. The job required communication, organizational, and computer skills.

The fifth was a position at Hampton Inn as a guest service agent, also full-time, which paid $8.00 per hour. The job required a high school diploma and included on-the-job training. It was light-duty and was a front desk clerical job involving greeting guests, checking them in and out, and processing monetary transactions.

Sixth and finally was another full-time position at Hampton Inn as a night auditor, paying $8.50 per hour. The job was sedentary in nature with no lifting above 20 pounds. The job required a high school diploma and a "customer service mentality"

4

and it included on-the-job training. All six positions were approved by Dr. Chiavacci, who stated that Claimant was physically capable of performing them. Mr. Smith concluded that Claimant's weekly earning power was $320.00 to $420.00. (WCJ's Finding of Fact No. 9.)

Claimant testified at a hearing before the WCJ on January 15, 2015. She explained that she was working as an LPN for Employer on October 2, 2010, when she injured her neck. She described ongoing problems since the work injury, with pain radiating from her neck to a midpoint in her back, as well as left arm pain and pain and numbness in both hands. She stated that the pain in her back takes her breath away and that her left shoulder is limited as far as being able to lift. She testified that she takes medications, including Oxycontin, Oxycodone, Flexeril, Lyrica, and Cymbalta, and that she has undergone injections to her arm, neck, and back. She noted that she has not returned to work but would be interested in working if she were physically able. She stated, however, that even light tasks, such as making dinner or folding clothes, cause her extreme pain, requiring her to take her prescription medications, which in turn makes her drowsy and feel the need to sleep. (WCJ's Findings of Fact Nos. 4-5.)

Concerning the LMS/EPA, Claimant testified that she attempted to apply to all six positions, but that she was not offered any position. Regarding the customer service representative position with A. Rifkin, Claimant testified that, although she lacked a customer background and was unable to type 35 words per minute while talking on the telephone, she called the number listed in the LMS/EPA on May 28, 2014. She subsequently submitted an online application on June 4, 2014, and received an email the following day informing her that she would be contacted if more information was needed or to schedule an interview; however, she never received any follow up. With respect to the account representative position with Telerex, she

testified that, beginning on May 28, 2014, she attempted to phone Telerex nine times, but the line was always busy. Regarding the customer service position with Navient, she testified that, although she felt she lacked the necessary skills for the position, she reached out to the employer on May 28, 2014, and spoke with a representative in human resources, but did not submit an application until June 2, 2014. Claimant stated that she received an email advising her that she was not hired around June 9, 2014. Regarding the customer sales position with Bank of America, Claimant testified that, on June 2, 2014, she tried to contact the designated contact person listed on the LMS/EPA, B.J. Berrettini, but was told there was no such person there. She stated that she gave her contact information but did not receive a call back. *Id.* Concerning the customer service and night auditor positions at Hampton Inn, Claimant testified she initially reached out on May 28, 2014, but was told that the contact person no longer worked there. The following day, a woman named Staci Borgia called her back and, according to Claimant, told her that the two positions were no longer available but that Hampton Inn did have two other positions available: breakfast host and housekeeper. (R.R. at 188a-91a, 203a-11a; WCJ's Finding of Fact No. 6.)[4]

In support of her position, Claimant submitted the deposition testimony of her treating physician, Dean Mozeleski, M.D. Board-certified in physical and rehabilitation medicine, Dr. Mozeleski testified that he first treated Claimant in February of 2011. He testified that because the LMS/EPA was based upon an examination in September of 2013, he based his testimony on his own examination in August of 2013. Dr. Mozeleski testified that Claimant's condition, for which she took a variety of medications, had progressively worsened since he began treating her. Dr.

---

[4] Throughout her testimony, Claimant relied upon written notes documenting her experience in applying for the six positions. These notes were admitted into evidence without objection. (R.R. at 206a.)

Mozeleski testified that, as of August of 2013, Claimant's range of motion in her neck had decreased in both directions with rotation. He stated that she had maximum foraminal encroachment, which placed pressure on the neck nerves and radiated pain into her left arms. He noted that Claimant had a decreased range of motion in her left shoulder and numbness and tingling in her left arm, extending into the fourth and fifth digits of her left hand. He testified that he reviewed a cervical MRI from April 24, 2013, which indicated findings consistent with the C-5-7 two-level fusion. He stated that there was no evidence of disc herniation because it had been surgically corrected and that the MRI indicated some reversal of cervical lordosis but no intrinsic cord abnormality. (WCJ's Finding of Fact No. 10.)

Dr. Mozeleski then testified about an October of 2013 evaluation of Claimant which indicated decreased rotation in her neck in both directions. He stated that Claimant also had left arm weakness and some numbness in both hands. He testified that he saw Claimant in December of 2013, and on April 2, 2014, and, because she had been suffering from these problems for some time, he labelled it "chronic neck and left shoulder pain, chronic cervical radiculitis, and chronic neck and upper thoracic scapular pain." (R.R. at 26a.) Claimant returned for an office visit on April 25, 2014, at which time Dr. Mozeleski released Claimant to light, sedentary work with restrictions because Claimant was only able to sit, stand, or walk for up to a combined total of two hours, with change in position as tolerated. According to Dr. Mozeleski, Claimant was able to lift no more than ten pounds, and then, only occasionally. He stated Claimant would be able to tolerate occasional bending, reaching, squatting, rotating, twisting, or kneeling, but no climbing. He believed Claimant was capable of performing simple grasping, pushing, pulling, and fine manipulation, but only for short

7

periods. He did not believe she was capable of returning to work on a full-time basis. (WCJ's Finding of Fact No. 11.)

Dr. Mozeleski testified that he examined Claimant most recently on November 12, 2014, and she presented with persistent neck and mid-back pain, pain into the left shoulder and mid-back into the left upper arm, and pain into her fingers and the inside part of her hand. As of that last appointment, Dr. Mozeleski testified that Claimant continued taking Oxycontin and Oxycodone. Regarding the six positions on the LMS/EPA, he stated that he reviewed each position and found that Claimant was not capable of performing any of the positions, noting that all were full-time. He concluded that these positions were not suitable because they included repetitive movements even when sitting, which Claimant could not perform. (WCJ's Finding of Fact No. 11.)

Claimant also submitted the deposition testimony of Carmine Abraham, who testified that she was certified to perform vocational assessments under the Act. She stated that after Claimant's case was assigned to her in April of 2015, she reviewed materials from Mr. Smith, including the LMS/EPA, along with medical records and reports. Ms. Abraham stated that she was aware of Claimant's formal schooling, which included a high school diploma and some business courses at Keystone Community College, and that she believed the business courses Claimant had taken in 1978 and 1979 had no vocational relevance to Claimant's employability in 2014. She found that Claimant's LPN position was considered a medium-skilled position, requiring skills that were medical in nature. Ms. Abraham also found that Claimant did not have "a whole lot of skills in regard to working with computers or in regard to supervisor skills in regard to hiring or firing people or interviewing people." (R.R. at 77a; WCJ's Finding of Fact No. 12.)

8

Ms. Abraham was able to personally meet with employees from four of the five companies identified in the LMS/EPA in March and April of 2015, and upon review, she rejected each of them. Ms. Abraham determined that, in her opinion, the A. Rifkin position would not have been appropriate for Claimant because she would have been unable to perform the job duties by typing with one finger at a time while looking at the keyboard. Ms. Abraham explained that, because Claimant would have to simultaneously attend to customers and provide them with the information they needed, the call would take too long. Additionally, based on Claimant's educational and vocational history, Ms. Abraham believed Claimant would not have been qualified for the position.

With regard to the Telerex position, Ms. Abraham explained that the contact person listed on the LMS/EPA indicated that the position was in a call-center type of environment where employees make and receive calls. Ms. Abraham noted that the calls were very time sensitive and were monitored by supervisors. Additionally, she testified, Telerex was looking for a candidate with computer skills in programs such as Windows OS, Internet, Microsoft Word, and the like. Ms. Abraham concluded that this position would have been outside Claimant's vocational and physical capabilities because it would not have allowed Claimant to physically change positions.

Ms. Abraham testified that the Navient position was also in a call-center environment, which was very similar to the Telerex position because the calls were monitored by supervisors and very time sensitive. The skills necessary for this position, Ms. Abraham testified, included navigating the internet and working with two computer screens simultaneously while typing. Further, Ms. Abraham testified that the position required the candidate to be literate in Word and Windows programs, and that

the position would not have allowed Claimant to continuously get up and move around. Ms. Abraham concluded that Claimant lacked the necessary skills for this position. (WCJ's Finding of Fact No. 13.)

With regard to the Bank of America position, Ms. Abraham stated that, on March 6, 2015, she went to the employer's address but was only able to speak to a security guard employed by a third party company, who indicated that there was no human resource or recruiting department at that facility and, upon searching the computer system, stated that there was no employee in the system with the name of the recruiter listed in the LMS/EPA. Ms. Abraham then called Bank of America's corporate headquarters and was told that all hiring was done online, that the company could not give out contact information for recruiters or human resource employees, and that a recruiter only becomes available once an online application is submitted. Although she was unable to obtain further information about the position, based on her review of the LMS/EPA materials, Ms. Abraham testified that Claimant lacked the qualifications for this position.

Finally, Ms. Abraham described the customer service position with Hampton Inn as a guest service agent or front desk clerk, which required the ability to use a computer and proficiency in typing. Ms. Abraham doubted whether Claimant would have been able to stand or sit as needed during the shift because the employer had indicated that it could not accommodate her, since being on one's feet was an essential function of that job. The other position with Hampton Inn was as a night auditor, which Ms. Abraham described as having the same duties as the guest service agent, with a significant difference being that the employee would have to complete the paperwork over the night hours. Ms. Abraham explained that, because the positions required the employee to stand for prolonged periods, Claimant would not have been

capable of performing either of the positions with Hampton Inn. (WCJ's Finding of Fact No. 13.)

The WCJ found Dr. Chiavacci and Mr. Smith more credible than Dr. Mozeleski and Ms. Abraham. He noted that both physicians found Claimant capable of returning to some type of work. The WCJ found it significant that Claimant "candidly admitted" to applying to some positions that she found on her own via newspaper ads, including a position at True Horse, which involved twelve-hour shifts, a cleaning position at Sovereign Bank, a nursing position at Comfort Keepers, and a position as a crossing guard. (WCJ's Finding of Fact No. 15.)

Although the WCJ did not make a specific credibility finding regarding Claimant's testimony about her experience in applying for the six positions, he did find: "Any testimony therefore from [C]laimant at [the] hearing that she did not believe that she was capable of working is indeed not at all consistent, even with Dr. Mozeleski finding [C]laimant capable of returning to some type of work." (WCJ's Finding of Fact No. 15.) Further, the WCJ found that it was "disingenuous" for Claimant to maintain that she had no transferable skills given her long career in the medical field, "where [C]laimant had abundant responsibilities in attending to patients' daily care for many years," which included "previous experience overseeing, training and instructing other individuals." (WCJ's Finding of Fact No. 15.)

The WCJ specifically rejected the conclusion of Ms. Abraham that Claimant lacked the skills necessary for any of the six jobs, finding that "[C]laimant nevertheless credibly acknowledged during her work as a nurse performing a variety of tasks in a high pressure environment including reading medical orders and dispensing medications to patients." (WCJ's Finding of Fact No. 15). Accordingly, the WCJ found that Claimant had a weekly earning capacity of $320.00 which resulted

11

in a weekly wage loss of $886.71, thereby entitling Claimant to partial disability benefits of $591.14 per week, effective June 10, 2014, the date the six positions were approved by Dr. Chiavacci. (WCJ's Findings of Fact Nos. 14-15.)

In light of the above, the WCJ granted Employer's modification petition. The WCJ noted that Employer and/or Insurer remained responsible for payment of Claimant's reasonable and necessary medical expenses related to the work injury. (WCJ's Findings of Fact Nos. 15-16; Conclusions of Law Nos. 2-3.)

Claimant appealed the decision to the Board, arguing that the six jobs could not be considered actually open and available if Claimant tried to apply and was unsuccessful. She also questioned how she could have any earning capacity given that she had tried to apply but could not obtain any of the positions. By opinion and order dated July 1, 2016, the Board rejected Claimant's arguments and affirmed the WCJ, applying the decision of our Supreme Court in *Phoenixville Hospital v. Workers' Compensation Appeal Board (Shoap)*, 81 A.3d 830 (Pa. 2013).

Claimant filed a petition for review with this Court,[5] raising the same arguments and emphasizing that the WCJ's "reliance on the assertion that the positions were open and available at the time [] the [LMS/EPA] was conducted," (Claimant's brief at 29), was misplaced since Claimant's testimony established that the jobs "were not actually open to [Claimant] when she applied," (Claimant's brief at 30), and thus the WCJ's finding was not in accordance with the standards set forth in *Phoenixville Hospital*.

---

[5] Our scope of review is limited to determining whether Findings of Fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer),* 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

## Discussion

In a workers' compensation proceeding, the WCJ is the ultimate fact finder and is the sole authority for determining the weight and credibility of evidence. *Lombardo v. Workers' Compensation Appeal Board (Topps Company, Inc.)*, 698 A.2d 1378, 1381 (Pa. Cmwlth. 1997). "As such, the WCJ is free to accept or reject the testimony of any witness, including medical witnesses, in whole or in part." *Id.* The WCJ's findings will not be disturbed on appeal when they are supported by substantial, competent evidence. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa. Cmwlth. 1995). "Substantial evidence is such relevant evidence which a reasonable mind might accept as adequate to support a finding." *Berardelli v. Workmen's Compensation Appeal Board (Bureau of Personnel, State Workmen's Insurance Fund)*, 578 A.2d 1016, 1018 (Pa. Cmwlth. 1990).

Moreover, where both parties present evidence, it is irrelevant that the record contains evidence which supports a finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether evidence exists that supports the WCJ's findings. *Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

Additionally, on appeal, all inferences drawn from the evidence shall be taken in favor of the party prevailing before the WCJ. *Krumins Roofing and Siding v. Workmen's Compensation Appeal Board (Libby)*, 575 A.2d 656, 659 (Pa. Cmwlth. 1990).

This is a case of first impression regarding the rights of claimants and employers under section 306(b) of the Act after our Supreme Court's decision in *Phoenixville Hospital*. Claimant argues that if she applies for a position listed on the LMS/EPA but does not get the job, the employer has not proven an earning capacity,

and so a modification petition must be denied. Conversely, Employer argues that a claimant's testimony that she applied unsuccessfully to the position is relevant but not dispositive, that is, the WCJ shall admit evidence of the claimant's unsuccessful efforts but he or she is not automatically compelled to reject the earning capacity found in the LMS/EPA.

Section 306(b)(1) allows wage loss benefits to be reduced to two-thirds of the difference between a claimant's average weekly wage and his or her "earning power," and the resulting partial disability rate shall be capped at 500 weeks.[6] Section 306(b)(2) provides in pertinent part:

> 'Earning power' shall be determined by the work the employee is capable of performing and shall be based upon expert opinion evidence which includes job listings with agencies of the department, private job placement agencies and advertisements in the usual employment area. Disability partial in character shall apply if the employee is able to perform his previous work or can, considering the employee's residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employee lives within this Commonwealth . . . . If the employer has a specific job vacancy the employee is capable of performing, the employer shall offer such job to the employee.

77 P.S. §512(2).

In *Phoenixville Hospital*, our Supreme Court addressed the situation of a claimant who was the subject of two LMS/EPAs, and who alleged that she had applied to all the jobs set forth in each LMS/EPA, and was not offered any position from any of the employers. The WCJ held that all the jobs were compatible with the claimant's working restrictions and relevant geographic area, and even though the WCJ rejected

---

[6] 77 P.S. §512(1).

14

the claimant's medical and vocational witnesses, he denied employer's modification petition because the claimant "ha[d] established that in good-faith [*sic*], she followed through on all the jobs referred to her by [e]mployer and that none of the referrals resulted in an offer of employment." *Id.* at 834. The Board affirmed, but was reversed by this Court, which held that what was decisive under section 306(b) was not whether the claimant applied for and received a job offer; rather, the question was whether the jobs identified in the LMS/EPA were actually open and available at the time of the LMS/EPA. *Phoenixville Hospital v. Workers' Compensation Appeal Board (Shoap)*, 2 A.3d 689, 697-98 (Pa. Cmwlth. 2010), *reversed*, 81 A.3d 830 (Pa. 2013).

On appeal from this Court, the Supreme Court reversed, holding that the key to understanding section 306(b) was what the legislature meant by the phrase, "substantial gainful employment that exists." 81 A.3d at 842. Thus, although "[s]ection 306(b) does *not* require that the claimant be offered a job," an employer may prevail on a modification petition under section 306(b) only if it proves "the existence of meaningful employment opportunities, and not the simple identification of jobs found in want ads or employment listings." *Id.* at 842-43 (emphasis in original). Accordingly, the Supreme Court reasoned, "evidence regarding the claimant's actual experience with the employers identified in the employer's labor market surveys may lend support for establishing contentions along these lines [that is, along the lines of proof of substantial gainful employment]." *Id.* at 844. Further, "[t]he jobs identified by the employer's expert . . . must thus be those jobs that are actually open and potentially available, not simply jobs that are already filled with existing employees." *Id.* at 843. The phrase "actually open and potentially available" is overcome by a claimant if he or she has a "reasonable opportunity" to apply for the job on the LMS/EPA, but the job is no longer available; "[i]f the job is already filled, it does not

15

'exist,' to afford [s]ection 306(b)'s language its commonly understood meaning." *Id.* at 846. Therefore, the Supreme Court not only reversed but also remanded, so that the claimant could be afforded the opportunity "to submit evidence regarding her or his experience in pursuing the jobs identified" in the LMS/EPA. *Id.* at 845. Such evidence, concluded the Court, "is undeniably relevant" in a case involving section 306(b), although "not dispositive of the earning power inquiry." *Id.* at 846.

Generally, the employer or insurer has a threshold burden in cases under section 306(b) to prove: (1) disability partial in character; and, (2) no specific job vacancy with the date-of-injury employer.[7] Once an employer or insurer proves these prerequisites, the burden of proof in a modification petition based on section 306(b) remains with the employer to establish a claimant's "earning power," that is, whether "the employee is able to perform his [or her] previous work or can, considering the employee's residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employee lives within this Commonwealth." 77 P.S. §512(2). Under the Act, such proof must be established by a "vocational expert who is selected by the department [of Labor and Industry] through regulation."[8] 77 P.S. §512(2). That vocational expert establishes a claimant's earning power.[9]

If the employer meets the prerequisites and proffers the report and testimony from the vocational expert, the WCJ must consider the qualifications of the

---

[7] In section 123.301 of its regulations, 34 Pa. Code §123.301, the Department of Labor and Industry outlines what the employer must prove to establish a job vacancy and/or job offer.

[8] The protocols for vocational experts have been established by the Department of Labor and Industry in the regulations set forth at 34 Pa. Code §§123.201-123.205.

[9] The requirements for "evidence of earning power" have been delineated by regulations set forth at 34 Pa. Code §123.302, which restates section 306(b)(2) of the Act in substantial form.

vocational expert and evaluate the contents of the LMS/EPA as well as the testimony of the vocational expert. *Altoona Wholesaler Distributors v. Workers' Compensation Appeal Board (Bell)*, 841 A.2d 651, 653-54 (Pa. Cmwlth. 2004). The WCJ may accept in whole or in part the evidence of the vocational expert. *Marx v. Workers' Compensation Appeal Board (United Parcel Service)*, 990 A.2d 107, 110 (Pa. Cmwlth. 2010) (affirming a WCJ's decision which determined that some of the job referrals in the LMS/EPA were appropriate to demonstrate earning power while others were not).

In the present case, the WCJ chose to find the testimony of Employer's vocational expert, Mr. Smith, more credible than the testimony of Claimant's vocational expert, Ms. Abraham.

Now, under the direction of our Supreme Court in *Phoenixville Hospital*, if the WCJ accepts the evidence of the vocational expert, the WCJ's inquiry is not over if the claimant "submits evidence regarding her or his experience in pursuing the jobs identified by the employer's vocational expert witness." 81 A.3d at 845. Evidence of unsuccessful employment applications "is undeniably relevant to rebut the employer's argument that the positions identified were proof of the potentiality of a claimant's substantial gainful employment." *Id.* at 846. In other words, a claimant may offer evidence that the position was "filled by the time the claimant had had a reasonable opportunity to apply for it. If the job is already filled, it does not 'exist,' to afford [s]ection 306(b)'s language its commonly understood meaning." *Id.*

In the present case, Employer met the prerequisites of section 306(b) and the accompanying regulations, and also offered vocational evidence in the form of an LMS/EPA and the testimony of Mr. Smith. The WCJ then allowed testimony from Claimant to address the vocational expert's evidence of job availability and earning power. As the Board noted, "[t]he claimant may attack a labor market survey by

17

showing that the survey was based on faulty, false, or misleading information, and evidence regarding the claimant's experience in applying for the jobs may support such a contention." (Board op. at 7.) However, under *Phoenixville Hospital*, such evidence from Claimant was "relevant," but "not dispositive." 81 A.3d at 846.

As the WCJ noted here, Claimant's work injury "date[d] back to 2010." (WCJ's Finding of Fact No. 15.) The WCJ assessed the credibility of Claimant and her vocational expert, and rejected their testimony as to earning power and transferable skills, finding Claimant's testimony contradictory and disingenuous, particularly since Claimant admitted to applying for jobs more difficult than those listed on the LMS/EPA, which she contended she could not perform. (WCJ's Finding of Fact No. 15.) Despite the surgery and treatment, the WCJ emphasized that both Dr. Mozeleski and Dr. Chiavacci "found [C]laimant capable of returning to some type of work." (WCJ's Finding of Fact No. 15.) The WCJ assessed the credibility of the medical experts and found Dr. Chiavacci, who approved the six jobs on the LMS/EPA, more credible. He further found Mr. Smith credible and so found that the six positions on the LMS/EPA were vocationally appropriate for Claimant. Moreover, the WCJ found that, to the extent that Ms. Abraham concluded otherwise, testifying that Claimant was not a good candidate for any of the positions, he rejected her testimony as not credible. (WCJ's Finding of Fact No. 15.)

Consequently, the WCJ found that Claimant had an earning power of $320.00 weekly, on the low end of the earning capacity identified by Mr. Smith. (WCJ's Finding of Fact No. 15, Conclusion of Law No. 2.) We see no error on the part of the WCJ in reaching this finding.

However, *Phoenixville Hospital* states that,

> The statutory concept of "substantial gainful employment which exists" would be meaningless with respect to a

18

claimant's actual medical and vocational circumstances unless the jobs identified by the employer's expert witness, which are used as the employer's proof of earning power under Section 306(b), remain open until such time as the claimant is afforded a reasonable opportunity to apply for them.

*Phoenixville Hospital*, 81 A.3d at 845.

Here, the WCJ accepted Employer's evidence regarding the positions identified in the LMS/EPA. As noted above, Claimant testified that she was only able to contact three of the employers, and, of those three, she was only able to apply to two, since the positions at Hampton Inn had been filled when she applied, which was 25 days, and in some cases, 27 days, after the receiving the LMS/EPA.[10] Claimant's expert, Ms. Abraham, however, was able to get in touch and meet with two of the listed contacts that Claimant testified she could not reach nearly a year after Claimant attempted to contact them. (R.R. at 178a-79a, 188a-89a.) We note that this is precisely the sort of testimony that *Phoenixville Hospital* mandated claimants be permitted to present. The Court stated:

> Evidence that the claimant pursued but failed to obtain gainful employment with the employers identified by the expert witness is undeniably relevant to rebut the employer's argument that the positions identified were proof of the potentiality of a claimant's substantial gainful employment. However, such evidence is, of course, not dispositive of the earning power inquiry. Moreover, a claimant must be afforded the opportunity to submit evidence that she or he did not obtain employment because the position identified by the employer's expert witness was already filled by the time the claimant had had a reasonable opportunity to apply for it. If the job is already filled, it does not "exist," to afford

---

[10] The LMS/EPA is dated May 8, 2014. (R.R. at 304a.) Claimant's notes indicated that she called five of the employers on May 28, 2014, and one on June 2, 2014, and that she submitted applications to two of them on June 2, 2014, and June 4, 2014. (R.R. at 188a-91a.)

19

Section 306(b)'s language its commonly understood meaning.

*Id.* at 846.

Although the *Phoenixville Hospital* Court did not further develop the concept of "a reasonable opportunity to apply," the Court made clear that "[t]he WCJ is charged with finding the facts necessary to support her or his decision that disposes of the motion to be decided. Whether a claimant had a 'reasonable opportunity' to apply and did, in fact, apply for an identified position (and whether the job was already filled by the relevant time) are factual matters that the WCJ is fully qualified to determine." *Id.*

Here, the Claimant presented evidence attempting to show that the LMS/EPA was based upon incorrect information in that the jobs were not open and available because she attempted to apply to all of the positions but was either turned down, told the position was unavailable, or unable to reach the contact person. The WCJ evaluated Claimant's testimony but did not find it was sufficient to demonstrate that Employer had not met its burden. Thus, while Employer maintains an ongoing burden to show that the jobs remained open and available, under *Phoenixville Hospital*, a claimant can present evidence to the contrary. As Employer stated in its brief, "The fact that [C]laimant did not secure a position with one of the potential employers does not negate the findings of the WCJ, which found the positions were within her capabilities and were open and available to her, specifically finding that [C]laimant was not credible about her incapacity to work at each of these jobs." (Employer's brief at 34.)

Hence, the WCJ found that the Employer met its burden and specifically stated,

> After having made a careful review of the evidence of record[,] this Judge has accepted as more credible and convincing the findings and opinions of both Dr. Chiavacci as well as Mr. Smith and . . . to the extent that either Dr. Mozeleski or Ms. Abraham finds the [C]laimant either not capable of physically performing the positions nor the positions being vocationally suitable for the [C]laimant, their testimony is less credible and less persuasive.

(WCJ's Finding of Fact No. 14.) In conclusion, the WCJ stated, "Clearly therefore there being positions relied upon by the [E]mployer herein that were **physically and vocationally appropriate** for [C]laimant **and open and available to her**[,] the [E]mployer's [m]odification [p]etition should be granted . . . ." (WCJ's Finding of Fact No. 15) (emphasis added).

Accordingly, accepting the WCJ's credibility determinations as outlined above, we conclude that there was substantial evidence to support the WCJ's finding that Employer established "meaningful employment opportunities" under section 306(b) of the Act. *Id.*

## Conclusion

We reject Claimant's argument that the mere presentation of evidence of unsuccessful application to jobs listed in a LMS/EPA mandated a finding that the positions were not open and available and that she lacked any earning capacity. Rather, as our Supreme Court stated in *Phoenixville Hospital*, such evidence from Claimant was "relevant" but not "dispositive" with regard to the earning power inquiry. 81 A.3d at 846.

Furthermore, although the Claimant's testimony on the application process is the sort of evidence that *Phoenixville Hospital* now requires a claimant be

21

permitted to present, in this case, the WCJ found that it failed to show that the jobs were not vocationally suitable or actually open and available.

Accordingly, the Board did not err in affirming the decision and order of the WCJ.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Laurie Valenta,                              :
                         Petitioner          :
                                             :    No. 1302 C.D. 2016
            v.                               :
                                             :
Workers' Compensation Appeal                 :
Board (Abington Manor Nursing                :
Home and Rehab and Liberty                   :
Insurance Company),                          :
                         Respondents         :

## *ORDER*


            AND NOW, this 7th day of December, 2017, the July 1, 2016 order of
the Workers' Compensation Appeal Board is hereby affirmed.


                              _____
                              PATRICIA A. McCULLOUGH, Judge