# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading School District and
PMA Management Corporation,
                Petitioners

        v.

Workers' Compensation Appeal
Board (Dismuke),
                Respondent

:
:
:
:
:
:
:
:
:
:
:
:

No. 269 C.D. 2020
Submitted: October 23, 2020

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE P. KEVIN BROBSON, Judge[1]
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                    **FILED:  October 22, 2021**

Reading School District and PMA Management Corporation (collectively, Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), dated February 12, 2020. The Board affirmed an order of a Workers' Compensation Judge (WCJ), which denied Employer's termination petition, Employer's suspension petition, and Employer's suspension/modification petitions.[2] For the reasons set forth below, we affirm the Board's order in part, vacate the Board's order in part, and remand the matter to the Board for further proceedings consistent with this opinion.

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson became President Judge.

[2] The WCJ also granted, in part, and denied, in part, the review petitions filed by Daniel Dismuke (Claimant). Given, however, that Claimant's review petitions are not the subject of this appeal, we will only discuss them to the extent that they are relevant to our disposition below.

# I. BACKGROUND

Claimant worked for Employer as a computer and business education teacher. On October 26, 2015, Claimant suffered an injury in the course and scope of his employment, when he tripped and hit his head on a block wall. (Reproduced Record (R.R.) at 974a.)[3] Employer accepted liability for a head contusion pursuant to a notice of temporary compensation payable (NTCP).[4] (*Id.*) Sometime thereafter, on May 16, 2016, Employer filed a termination petition, alleging that Claimant had fully recovered from his work-related injury as of March 9, 2016. (*Id.* at 1a.) Additionally, on June 7, 2016, Employer filed a suspension petition, alleging that, on May 19, 2016, "Claimant was offered work within his physical capabilities and at pre-injury wages but failed to accept said job offer." (*Id.* at 3a.) Subsequent thereto, on August 1, 2016, Claimant filed a review petition, alleging that the description of his work-related injury is incorrect and should be amended to include mild traumatic brain injury and aggravation of preexisting neck pain.[5] (*Id.* at 5a.) Claimant filed a second review petition on October 26, 2016, again alleging that the description of his work-related injury is incorrect and should, instead, be amended

---

[3] We note that Employer's Reproduced Record does not comply with Pennsylvania Rule of Appellate Procedure 2173 in that, after page 999a, Employer restarted the page numbering at 0a, rather than continuing with the original pagination—*i.e.*, 1000a, 1001a, 1002a, etc. In order to avoid confusion, we will cite to any page numbers after 999a as if they were included in a second volume. For example, we will cite to what Employer should have numbered as 1001a as "R.R. Vol. II at 1a."

[4] The NTCP subsequently converted to a notice of compensation payable (NCP) by operation of law.

[5] At the hearing held on March 8, 2017, Claimant amended this review petition to further allege an incorrect calculation of his average weekly wage. (R.R. Vol. II at 60a-67a.) By stipulation dated September 18, 2017, the parties partially resolved that review petition by agreeing that Claimant's average weekly wage did not account for certain wages and, therefore, should be increased to $1,549.86.

to include "traumatic brain injury, aggravation of cervical degenerative disc disease, and myofascial pain of neck and shoulder." (*Id.* at 9a.) Thereafter, on September 21, 2017, Employer filed two suspension/modification petitions, alleging that, on August 1, 2016, and December 19, 2016, Claimant was offered a specific job but failed to return to work. (*Id.* at 17a, 20a.)

Claimant testified before the WCJ at hearings held on September 19, 2016, March 8, 2017, and May 31, 2017. At those times, Claimant testified that, on October 26, 2015, he was walking up the stairs of the parking garage attached to the school at which he worked when he tripped and hit the top of the right side of his head on a concrete wall. (R.R. at 992a-93a; R.R. Vol. II at 74a-75a.) Immediately thereafter, Claimant experienced head and neck pain, confusion, and dizziness. (R.R. Vol. II at 76a-78a.) Since that time, Claimant has treated and continues to treat with various medical providers for a concussion, cognitive issues, and neck and shoulder pain. (*Id.* at 4a, 84a-87a, 253a, 257a, 260a-63a, 288a-91a; R.R. at 995a-97a.) Claimant also indicated that he continues to experience neck pain, difficulty sleeping, headaches, anxiety, and cognitive issues as a result of the October 26, 2015 work-related incident. (R.R. Vol. II at 88a-94a, 291a-93a.)

Claimant further testified that, prior to the October 26, 2015 work-related incident, he had been treating for a preexisting neck condition—pain and discomfort at the base of his neck—and had been receiving trigger point injections and pneumatic traction. (R.R. Vol. II at 4a-11a, 78a-80a, 273a-74a.) Claimant explained, however, that, following those treatments, his neck pain had improved by 90%. (*Id.* at 80a-82a.) Following the October 26, 2015 work-related incident, however, the pain had worsened and had extended to the top of his right shoulder. (*Id.*)

3

Claimant also testified that he worked for Employer as an eighth and ninth grade computer and business education teacher. (R.R. Vol. II at 15a, 74a.) He explained that there were many challenges inherent with that position, including working with mentally disabled students, emotionally disturbed students, students who did not speak English, and gang members, as well as dealing with physical altercations, challenges to authority, and physical threats. (*Id.* at 16a-17a, 97a-103a.) He indicated that there are no teachers' aides or security guards in the classrooms, and, while he can call a security guard for assistance if there is an altercation in his classroom, oftentimes a security guard does not show up. (*Id.* at 101a-02a.) Claimant admitted that he received job offer letters from Employer in May 2016 and thereafter, but he indicated that he did not return to work because his cognitive issues have prohibited him from doing so and Employer did not offer him any accommodations—*i.e.*, restoration of police to the building, a placement program for the most violent students, more security officers, a bilingual teaching aide, and a modified schedule—to account for those cognitive issues. (*Id.* at 14a-15a, 103a-04a, 280a, 286a-87a, 291a, 306a-13a.) He explained:

> One of the jobs we have I was just mentioning is keeping the kids safe. We have a lot of gang members. We have a lot of, unfortunately, young men who don't have people at home who can help them behave and understand the benefit of that. And I have a very difficult time with more than a couple of minutes maintaining my attention. It's very difficult for me.
>
> I did not think I could adequately protect myself or my kids from those children . . . .[6]

(*Id.* at 18a.)

---

[6] Claimant also offered the testimony of Kristine A. Marino (Marino), another teacher in Employer's business education department, who essentially reiterated Claimant's concerns regarding Employer's teaching environment and the security/safety issues inherent in the classroom. (*See* R.R. Vol. II at 191a, 195a-99a.)

Claimant also acknowledged that he had filed a civil action against Employer and that, at least initially, he represented himself and prepared/drafted certain legal pleadings. (R.R. Vol. II at 27a-29a.) Claimant explained, however, that, except for a few minor modifications, most of the legal pleadings, including the complaint, were prepared prior to the October 26, 2015 work-related incident. (*Id.* at 29a-32a, 107a-08a.) Claimant further explained that, although he was able to prepare some legal pleadings after the October 26, 2015 work-related incident, those legal pleadings took multiple days to prepare and required a quiet environment with no interruptions or distractions. (*Id.* at 109a-10a.)

In support of its petitions, Employer offered the deposition testimony of Donald M. McCarren, D.O., who is board certified in neurology. (R.R. at 426a-27a.) Dr. McCarren conducted an independent medical examination (IME) of Claimant on March 9, 2016, which included reviewing Employer's security camera footage of Claimant's injury, conducting a neurological and physical examination of Claimant, obtaining a history, and reviewing Claimant's medical records. (*Id*. at 429a-45a.) Dr. McCarren explained that, based upon his review of the security video of Claimant's injury, there is no evidence that Claimant lost consciousness after he struck his head, thus indicating a less severe contusion. (*Id.* at 431a-34a, 473a-74a.) Dr. McCarren admitted, however, that concussion symptoms can occur several minutes after an individual sustains a blow to the head. (*Id.* at 466a.) Dr. McCarren further explained that the results of Claimant's neurological examinations, which assessed Claimant's memory, attention, overall cognitive function, visual acuity, and motor function, were within the normal ranges of an adult of Claimant's education. (*Id*. at 439a-44a.) Based on the results of his IME, Dr. McCarren opined within a reasonable degree of medical certainty that Claimant had fully recovered from his

October 26, 2015 work-related injury and was not suffering from any cognitive or neurologic dysfunction as a result thereof. (*Id*. at 446a-47a, 455a, 474a.) Dr. McCarren further opined that Claimant was capable of returning to full-duty work as a teacher without restrictions. (*Id.* at 444a-47a, 455a.)

Employer also offered the deposition testimony of Heather M. Nissley, Ph.D., who is a licensed psychologist.[7] (R.R. at 333a.) Dr. Nissley testified that she performed an evaluation of Claimant on March 23, 2016, which included reviewing Claimant's medical records, obtaining a medical, psychiatric, and social history, and performing a clinical/cognitive examination. (*Id*. at 336a-82a.) At the time of the evaluation, Claimant complained of headaches, balance issues, and cognitive problems, specifically slower thinking, difficulty with reading tolerance, and becoming overwhelmed in large groups, all of which Claimant reported he experienced for the first time following the October 26, 2015 work-related injury. (*Id*. at 338a-39a.) Dr. Nissley conducted various tests to evaluate Claimant's cognitive abilities, which revealed that Claimant was performing in the low to average range across most cognitive domains. (*Id*. at 341a.) Despite these findings, Dr. Nissley ultimately opined within a reasonable degree of neuropsychological certainty that Claimant did not experience any cognitive changes or post-concussion syndrome as a result of the October 26, 2015 work-related incident and that he had no functional limitations preventing him from returning to work as a teacher. (*Id*. at 385a-86a, 388a.) Dr. Nissley did not, however, believe that, from a cognitive

---

[7] Dr. Nissley initially evaluated Claimant on a referral from one of Claimant's treating physicians. (R.R. at 335a-36a.) Following the evaluation, however, Claimant became concerned that Dr. Nissley's evaluation was biased and he developed a general distrust of Dr. Nissley because the results of her evaluation "were not shared with him in completion." (*Id*. at 223a-24a.) As a result, Kimberly G. Heckert, M.D., one of Claimant's treating physicians, referred Claimant to Jennifer Tinker, M.D., a neuropsychologist, for a second opinion. (*Id.* at 224a.)

6

perspective, Claimant had fully recovered from his October 26, 2015 work-related injury. (*Id*. at 413a-14a.) In addition, Dr. Nissley seemed to agree that a head contusion alone would not be an accurate description of Claimant's work-related injury and that, at least initially, Claimant suffered a concussion with a mild traumatic brain injury. (*Id*. at 411a.)

Employer further offered the deposition testimony of John Grandrimo, D.O., who is board certified in orthopedic surgery. (*Id*. at 585a.) Dr. Grandrimo conducted an IME of Claimant on December 16, 2016, which included taking a medical history, reviewing Claimant's medical records, and conducting a physical examination. (*Id*. at 586a-87a.) With respect to his review of Claimant's medical records, Dr. Grandrimo noted that, prior to the October 26, 2015 work-related incident, Claimant had been diagnosed with degenerative disc disease of the cervical spine and had issues with his left shoulder following a motor vehicle accident. (*Id*. at 593a-95a.) Dr. Grandrimo testified that he compared magnetic resonance imaging (MRI) of Claimant's left shoulder and cervical spine performed both before and after the October 26, 2015 work-related incident, which demonstrated little change in Claimant's degenerative condition and no evidence of acute pathology. (*Id.* at 596a.) Based on the results of his IME, Dr. Grandrimo opined within a reasonable degree of medical certainty that Claimant only suffered a head contusion as a result of the October 26, 2015 work-related incident and that, by the time of his IME, Claimant had fully recovered therefrom. (*Id.* at 599a, 601a-02a.) While he acknowledged that Claimant likely suffers from degenerative disc disease and myofascial pain in his neck and right shoulder, Dr. Grandrimo did not believe that such conditions were aggravated and/or caused by the October 26, 2015 work-related incident. (*Id*. at 599a-601a.) Consequently, Dr. Grandrimo testified

7

that Claimant was capable of returning to work full duty without restrictions. (*Id.* at 601a.)

Employer also presented the testimony of Lisa M. Magrowski (Magrowski), Employer's Director of Employee Benefits and Risk Management. (R.R. Vol. II at 140a.) Magrowski testified that she sent Claimant three separate letters, wherein Employer offered Claimant his pre-injury position.[8] (*Id.* at 141a-45a; *see also* R.R. at 961a-74a.) The first letter, dated May 19, 2016, informed Claimant that, based on the results of the IME performed by Dr. McCarren, he was fully recovered from his work-related injury and Employer expected him to return to his pre-injury position on May 25, 2016. (R.R. at 961a-64a.) In the second letter, dated August 1, 2016, Employer again offered Claimant his pre-injury position based on the results of Dr. McCarren's IME. (*Id.* at 965a.) Employer referenced and attached a Notice of Ability to Return to Work dated May 17, 2016, and informed Claimant that it expected him to return to work on August 24, 2016. (*Id.* at 965a, 969a.) In the last letter, dated December 19, 2016, Employer again offered Claimant his pre-injury position, but this time, Employer's job offer was based upon the results of the neuropsychological examination performed by Dr. Tinker, Claimant's treating neuropsychologist. (*Id.* at 970a.) Employer asserted that Dr. Tinker's report suggested that Claimant was able to return to work with specific restrictions, and Employer, therefore, proposed a meeting between Claimant and Employer to "discuss any reasonable accommodations [Claimant would] require . . . to be successful in [his] position." (*Id.*) Attached to this letter was a new Notice of Ability

---

[8] The job offer letters were signed by Lisa Hoffman. (R.R. at 961a-74a; R.R. Vol. II at 139a.) Hoffman was Magrowski's last name before her recent marriage. (R.R. Vol. II at 139a.)

8

to Return to Work, dated December 19, 2016, that Employer issued on the basis of Dr. Tinker's report. (*Id*. at 971a.)

Magrowski testified further that Claimant did not respond to the job offer letters, communicate to Magrowski why he could not accept the job offers, or attend any meetings with Employer to discuss potential accommodations or his ability to return to work. (R.R. Vol. II at 145a-52a.) Magrowski admitted, however, that, while there had been general discussions between Claimant and Employer regarding accommodations, Employer never offered any specific accommodations to Claimant. (*Id.* at 163a-64a.) Magrowski also explained that, after reviewing Dr. Tinker's report, she could not discern any specific accommodations that Employer could offer to Claimant. (*Id*. at 146a-47a.) She, therefore, insisted that Employer did not have enough details to offer accommodations to Claimant without first meeting with him. (*Id*. at 165a-67a.) Magrowski, nevertheless, revealed that Employer had rejected Claimant's accommodation requests for additional school police in the building and for a bilingual teaching aide in his classroom. (*Id*. at 166a.)

Employer also offered into evidence, *inter alia*: (1) correspondence between Claimant and Magrowski, Khalid Mumin (Mumin), Employer's Superintendent, and Christopher Celmer (Celmer), Employer's Assistant Superintendent; and (2) a collection of legal pleadings filed by Claimant, *pro se*, in a separate civil action that Claimant had filed against Employer. (*See* R.R. at 303a-26a, 644a-960a.)

In support of his review petitions and in opposition to Employer's petitions, Claimant offered the deposition testimony of Steven Mark Evans, D.O., who is board certified in emergency and occupational medicine.[9] (R.R. at 100a.) Dr. Evans

---

[9] Claimant was a patient of Dr. Evans' medical practice prior to the October 26, 2015 work-related incident, but Dr. Evans did not see Claimant until April 15, 2016. (R.R. at 101a-02a.)

9

testified that he first examined Claimant on April 15, 2016, at which time Claimant complained of neck pain that radiated into his right shoulder. (*Id.* at 101a-02a.) Although Claimant had previously sought treatment for his neck condition, he claimed that his symptoms had significantly worsened since the October 26, 2015 work-related incident. (*Id*. at 102a.) Dr. Evans performed a physical examination, noting that Claimant had tenderness to palpation of his cervical spine, decreased range of motion, and a positive Spurling's maneuver to the right which produced periscapular pain. (*Id*. at 103a.) Dr. Evans also reviewed an MRI of Claimant's cervical spine, which revealed diffuse cervical spondylosis, arthritic changes, degenerative disc disease, and some evidence of muscle spasm, with no acute injury, and an MRI of Claimant's right shoulder, which revealed some rotator cuff and inflammatory findings but nothing that could be considered posttraumatic. (*Id*. at 106a, 114a-15a.)

Since Claimant's initial visit with Dr. Evans on April 15, 2016, Dr. Evans has continued to treat Claimant on a frequent basis—*i.e.*, every month or every other month. (R.R. at 106a-07a.) Based upon his review of Claimant's medical records and diagnostic testing, his clinical examination, and his treatment of Claimant, Dr. Evans opined within a reasonable degree of medical certainty that, in addition to a traumatic brain injury, Claimant also suffered a cervical strain superimposed upon his preexisting cervical spondylosis, as well as myofascial pain of his neck and right shoulder. (*Id*. at 106a, 112a, 116a.) Dr. Evans explained that, while it was difficult "to parse out what percentage of [Claimant's] ongoing symptoms" were caused by his preexisting disease versus the October 26, 2015 work-related incident, he "fe[lt] confident in saying that at least a percentage of [Claimant's] ongoing symptoms [we]re work-related." (*Id*. at 112a-13a.) Dr. Evans admitted, however, that he

10

believed Claimant could return to work full duty with some lifting restrictions and repetitive neck motion restrictions, which would likely not be applicable to his position as a teacher. (*Id*. at 116a-17a.)

Claimant also offered the deposition testimony of Dr. Tinker, a board eligible neuropsychologist.[10] (R.R. at 136a-37a.) Dr. Tinker performed a neuropsychological evaluation of Claimant on October 3, 2016, during which she obtained a history, she engaged in a clinical interview of Claimant, she reviewed Claimant's medical records, and she administered a battery of cognitive tests. (*Id*. at 140a-45a.) Dr. Tinker explained that she developed an individualized set of cognitive tests for Claimant based upon his cognitive complaints, which were predominantly related to attention, concentration, and processing speed. (*Id*. at 145a.) Dr. Tinker further testified that the results of the cognitive tests revealed that Claimant was struggling in areas where a person of his age and educational background typically would not. (*Id.* at 147a-50a.) Specifically, Claimant had trouble with organization of information on memory tasks and sustained visual attention, and his performance of processing speed tasks was borderline impaired. (*Id*. at 148a-50a.) Based on the results of her evaluation, Dr. Tinker opined within a reasonable degree of neuropsychological certainty that, as a result of the October 26, 2015 work-related incident, Claimant suffered a concussion and thereafter developed post-concussion syndrome and that Claimant has not fully recovered therefrom. (*Id*. at 150a-51a, 153a, 163a.) Dr. Tinker further opined that, based upon Claimant's reduction in attention and cognition and Claimant's description of his teaching environment with Employer—*i.e.*, occasional student

---

[10] At the time of her deposition, Dr. Tinker was in the process of obtaining her certification from the American Board of Professional Psychology, with a specialization in neuropsychology. (R.R. at 137a.)

11

violence, gang activity, lack of security guards or teachers' aides, and teaching/supervising emotionally disturbed, special education, and mentally disabled students—Claimant was not capable of returning to work in his pre-injury position. (*Id*. at 155a-57a, 184a.) Dr. Tinker also noted that, while there was a "striking difference" between her and Dr. Nissley's conclusions relative to Claimant's cognitive and functional impairment and ability to return to work, the results of their cognitive testing were "quite similar." (*Id*. at 160a-64a, 177a.) Dr. Tinker also indicated that the fact that Claimant may have prepared legal pleadings for his civil action against Employer did not in any way impact her opinion regarding Claimant's cognitive impairment. (*Id*. 186a-89a, 193a.)

Claimant also offered the deposition testimony of Dr. Heckert, who is board certified in physical medicine and rehabilitation and brain injury medicine. (R.R. at 213a.) Dr. Heckert first treated Claimant on April 27, 2016, for a second opinion regarding treatment options for his ongoing cognitive concerns. (*Id*. at 218a, 220a.) At that time, Claimant complained of cognitive difficulties, neck pain, headaches, and sleep disturbances. (*Id*. at 218a-19a.) After obtaining a medical history, reviewing Claimant's medical records, and conducting a physical and neurological examination, Dr. Heckert's initial impression was that Claimant had sustained a "mild brain injury . . . with residual cognitive impairment, daily post-traumatic headaches, and persistent neck pain." (*Id*. at 218a-22a.) Dr. Heckert believed that Claimant's treatment up to that time had been appropriate but that his sleep difficulties required more attention and, therefore, she recommended that he take melatonin, minimize evening stimulation, and try an anti-depressive medication to help facilitate sleep. (*Id*. at 222a-23a.) Claimant returned to Dr. Heckert for further treatment on July 25, 2016, and January 25, 2017. (*Id*. at 225a-26a, 247a.)

Based upon her evaluation and treatment of Claimant, Dr. Heckert opined within a reasonable degree of medical certainty that, as a result of the October 26, 2015 work-related incident, Claimant sustained a mild traumatic brain injury and post-concussion syndrome with impaired cognitive performance, chronic neck pain—including aggravation of his cervical degenerative disc disease and myofascial pain of his neck and shoulder—and disordered sleep. (R.R. at 228a-30a, 232a-33a.) Dr. Heckert explained that loss of consciousness was not necessary for a concussion diagnosis and that the symptoms of a concussion can take moments to days to manifest. (*Id.* at 230a.) Dr. Heckert admitted that the normal recovery time for a mild brain injury is within six months. (*Id.* at 262a.) When questioned why Claimant, fifteen months after the October 26, 2015 work-related incident, had not yet fully recovered, Dr. Heckert responded that Claimant had several unresolved factors—chronic pain, disturbed sleep, side effects of medication, and mood—that were contributing to his post-concussion syndrome and delaying his recovery. (*Id.* at 262a-63a.) Dr. Heckert further indicated that she would not advise that Claimant return to work for Employer in the teaching environment that Claimant had described, mainly due to safety concerns—*i.e.*, that Claimant may not be able to react quickly enough to prevent potential harm to himself or his students. (*Id.* at 234a-38a, 253a.) Dr. Heckert noted, however, that Claimant would, at a minimum, need a security guard in his classroom and adequate rest breaks throughout the day to return to work. (*Id.* at 267a-68a.) Dr. Heckert further testified that Claimant's ability to prepare legal pleadings would not have been greatly affected by the October 26, 2015 work-related injury, because Claimant would have been able to "continue to work on [his] case in his home environment where he wouldn't have other distractions and could take breaks as often as he would need

13

to." (*Id.* at 238a.)  She explained that Claimant's ability to work as a teacher for Employer and his ability to prepare legal pleadings

> are two completely separate situations.  I have not worked on legal [pleadings], before, but, I mean, to the extent that that might require reading documents or talking to attorneys, that is something that he can work on at a slowed pace in a controlled environment.  That is very different from being responsible for the well[-]being of children in an environment that is potentially hostile.

(*Id.* at 239a.)

On September 11, 2018, the WCJ issued a decision, granting, in part, and denying, in part, Claimant's review petitions and denying Employer's termination petition, suspension petition, and suspension/modification petitions.  In so doing, the WCJ summarized the witnesses' testimony and made the following credibility determinations and relevant factual findings:

> 61. This [WCJ] has carefully reviewed the testimony and evidence that has been presented in this matter.  Based upon such review, this [WCJ] hereby accepts the testimony and medical opinions of Dr. Heckert relating to the nature of the injury to [Claimant's] head that [he] sustained as a result of his incident of injury on October 26, 2015, as competent, credible, and worthy of belief, for the reasons articulated by her at the time of her deposition.  In addition, this [WCJ] hereby also accepts the testimony and medical opinions of Dr. Tinker, Dr. McCarren, and Dr. Nissley in that regard as competent, credible, and worthy of belief as well, to the extent that their said testimony and medical opinions were not inconsistent with the competent and credible testimony and medical opinions of Dr. Heckert.  Furthermore, this [WCJ] hereby specifically rejects the medical opinion of Dr. Grandrimo that . . . [C]laimant sustained only a contusion of his head as a result of his incident of injury on October 26, 2015, as lacking credibility, based upon the mechanism of his injury as revealed by the video evidence of his incident of injury on that date, his reported cognitive symptoms and problems thereafter, and the findings from the neuropsychological testing performed by both Dr. Tinker and Dr. Nissley.
>
> . . . .

14

62. This [WCJ] has also carefully reviewed the medical testimony and evidence relating to . . . [C]laimant's alleged injury to his neck or cervical spine that has been presented in this matter. Based upon such review, this [WCJ] hereby accepts the testimony and medical opinions of Dr. Grandrimo in that regard as competent, credible, and worthy of belief, for the reasons articulated by him in his medical report and at the time of his deposition. In addition, this [WCJ] hereby specifically rejects the medical opinion of Dr. Evans that . . . [C]laimant sustained a strain of his cervical spine superimposed upon his pre[]existing cervical spondylosis as a result of his incident of injury on October 26, 2015, as well as the testimony and medical opinions of Dr. Heckert relating to . . . [C]laimant's alleged work-related injuries to his neck or cervical spine, as lacking credibility . . . .

. . . .

e. . . . [A]lthough this [WCJ] does not doubt that . . . [C]laimant developed increased pain in his neck and right shoulder following his incident of injury on October 26, 2015, this [WCJ] believes that it is more appropriate to understand that pain and those symptoms to represent a recurrence and continuation of his pre[]existing pain and symptoms in his neck and right shoulder, and not a new work-related injury or a material aggravation of the pre[]existing condition of his cervical spine.

. . . .

63. This [WCJ] has also carefully reviewed the medical testimony and evidence relating to . . . [C]laimant's recovery from his work-related injury of October 26, 2015, and his disability and ability to return to work, that has been presented in this matter. Based upon such review, this [WCJ] hereby accepts the testimony and medical opinions of Dr. Evans, Dr. Tinker, and Dr. Heckert relating to those matters as they are summarized in the foregoing Findings of Fact as competent, credible, and worthy of belief, for the reasons articulated by them at the times of their depositions. In addition, this [WCJ] hereby specifically rejects the testimony and medical opinions of Dr. McCarren, Dr. Nissley, and Dr. Grandrimo relating to those matters as lacking credibility, for the following reasons:

a. There has been no testimony or evidence presented in this matter that . . . [C]laimant was having any cognitive impairments or problems prior to his incident of injury on October 26, 2015.

15

b. At the time of her neuropsychological evaluation and testing on October 3, 2016, Dr. Tinker found that . . . [C]laimant had weaknesses in his selective visual attention, sustained visual attention, cognitive processing speed, and in organizing information in performing memory tasks, which indicated that he had not yet made a full recovery from the cognitive impairments that he sustained as a result of his work-related injury of October 26, 2015, and that he was not yet capable of returning to work in his pre-injury job or position as a teacher of students in the eighth and ninth grades at . . . [Employer], without some modifications or accommodations in that job or position.

c. At the time of her neuropsychological evaluation and testing on March 23, 2016, Dr. Nissley made some similar positive findings, which corroborated some of . . . [C]laimant's reported cognitive problems, and which should have indicated to her that he was not yet capable of returning to work in his pre-injury job or position as a teacher of students in the eighth and ninth grades at . . . [Employer], without some modifications or accommodations in that job or position.

d. Based upon . . . [C]laimant's testimony, which was largely corroborated by the highly credible testimony of Ms. Marino, this [WCJ] hereby finds and concludes that at all times pertinent to this matter, a teacher of students in the eighth and ninth grades in the business department at . . . [Employer] needed to have an alert and sharp mind, and had to be in full possession of all of his mental and cognitive faculties, in order to maintain some semblance of order in the classroom and do his or her part to maintain the safety and security of his or her students. Therefore, since . . . [C]laimant was found to be still suffering from some relevant cognitive impairments at the time of the neuropsychological evaluation and testing performed by Dr. Tinker on October 3, 2016, this [WCJ] verily believes that he was not yet capable of returning to work in his pre-injury job or position as a teacher at . . . [Employer], without some modifications or accommodations in that job or position, as a result of the residual effects of his work-related injury of October 26, 2015.

16

(WCJ's Decision at 23-26.) Based on these credibility determinations and relevant factual findings, the WCJ concluded that Claimant had met his burden of proving that the description of his injury as set forth in the NTCP is materially incorrect and should, in addition to a head contusion, include "a mild traumatic brain injury and . . . post-concussion syndrome[] with impaired cognitive performance." (*Id*. at 23.) The WCJ further concluded, however, that Claimant had not sustained his burden in demonstrating a compensable injury to his cervical spine, either as a strain, an aggravation of preexisting degenerative disc disease, or myofascial pain in his neck or right shoulder. As to Employer's termination petition, the WCJ concluded that Employer had not met its burden of establishing that, as of March 9, 2016, or at any time thereafter at least through May 31, 2017, Claimant had fully recovered from his October 26, 2015 work-related injury. As to Employer's suspension and suspension/modification petitions, the WCJ concluded that Employer had not sustained its burden of proving that Claimant was capable of returning to work in his pre-injury position as a teacher without some modifications to that position. Employer appealed to the Board, which affirmed the WCJ's decision. Employer now petitions this Court for review.

## II. ARGUMENTS ON APPEAL

On appeal,[11] Employer argues that the Board erred by affirming the WCJ's decision to deny Employer's termination petition, suspension petition, and suspension/modification petitions because: (1) the WCJ's finding of ongoing work-related disability is not supported by substantial evidence; (2) the WCJ erred

---

[11] "Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence[,] and whether constitutional rights were violated." *Combine v. Workers' Comp. Appeal Bd. (Nat'l Fuel Gas Distrib. Corp.)*, 954 A.2d 776, 778 n.1 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 961 (Pa. 2009).

17

in determining that Employer failed to meet the requirements of *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 532 A.2d 374 (Pa. 1987); (3) the WCJ's decision was not reasoned as required by Section 422(a) of the Workers' Compensation Act (Act);[12] and (4) the WCJ capriciously disregarded relevant evidence—*i.e.*, the legal pleadings drafted by Claimant in the civil action that he filed against Employer and the correspondence between Claimant and Magrowski, Mumin, and Celmer relative to Employer's offers of employment to Claimant.[13]

## III. DISCUSSION

### A. Substantial Evidence

Employer contends that the record lacks substantial evidence to support the WCJ's finding that Claimant has an ongoing work-related disability, because the testimony of Dr. Tinker and Dr. Heckert is incompetent and equivocal. More specifically, Employer argues that the opinions of Dr. Tinker and Dr. Heckert were based on erroneous assumptions of fact; namely, that Claimant would have no support system of security guards if he returned to work for Employer, and that Claimant's sleep disturbances started after the October 26, 2015 work-related incident. Because Dr. Tinker and Dr. Heckert allegedly based their opinions upon these erroneous assumptions, Employer argues their testimony is incompetent. Employer then claims that Dr. Tinker and Dr. Heckert made admissions during their

---

[12] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 834.

[13] We have separated and reordered Employer's arguments for the purposes of discussion. In addition, we note that, while Employer has raised different theories of error—*i.e.*, substantial evidence, requirements under *Kachinski*, reasoned decision, and capricious disregard—its arguments mostly revolve around the alleged inconsistencies in Dr. Heckert's and Dr. Tinker's testimony and the WCJ's alleged failure to properly consider the legal pleadings and correspondence. Given, however, that each theory of error requires us to consider a separate legal standard, we will address each of Employer's arguments separately.

testimony, wherein they revealed that Claimant's current cognitive impairment is significantly related to his chronic pain and sleep disturbances from his neck and shoulder conditions. These admissions, Employer insists, are inconsistent with their testimony on direct examination, where they opined that Claimant's cognitive impairment was related to his head contusion and post-concussion syndrome—*i.e.*, his October 26, 2015 work-related injury. According to Employer, these inconsistencies render their testimony equivocal.

Claimant responds that, despite Employer's attempt to grasp at straws relative to the fact that Dr. Tinker and Dr. Heckert "may have been mistaken about the number of security guards available" in the building, the WCJ's finding of ongoing work-related disability is supported by the medical evidence as a whole. (Claimant's Brief at 25.) Claimant proceeds by noting that Employer's own expert neuropsychologist, Dr. Nissley, agreed that Claimant had demonstrable cognitive impairments, which is in accordance with Dr. Tinker's findings. Claimant further argues that the WCJ's decision to credit Dr. Tinker's and Dr. Heckert's testimony over the testimony of Employer's experts regarding Claimant's cognitive impairment and his ability to return to work is unsurprising considering that "the unfakeable neuropsychological testing supported a finding of ongoing relevant cognitive deficits" and their testimony accurately assessed the impact of Employer's work environment on such deficits. (*Id.* at 24.)

In workers' compensation proceedings, the WCJ is the ultimate finder of fact. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143 (Pa. Cmwlth. 2004). As fact-finder, matters of credibility, conflicting medical evidence, and evidentiary weight are within the WCJ's exclusive province. *Id.* If the WCJ's findings are supported by substantial evidence, they are binding on

19

appeal. *Agresta v. Workers' Comp. Appeal Bd. (Borough of Mechanicsburg)*, 850 A.2d 890, 893 (Pa. Cmwlth. 2004). We may only reverse a WCJ's findings if they are unsupported by substantial evidence or are arbitrary or capricious. *B & T Trucking v. Workers' Comp. Appeal Bd. (Paull)*, 815 A.2d 1167, 1170 (Pa. Cmwlth. 2003). In making this determination, we may not "reweigh the evidence or the credibility of the witness[es], but [must] simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole." *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support contrary findings; the relevant inquiry is whether substantial evidence supports the WCJ's necessary findings. *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

To succeed in a termination petition, the employer bears the burden to prove that the claimant's disability has ceased and/or that any current disability is unrelated to the claimant's work injury. *Jones v. Workers' Comp. Appeal Bd. (J.C. Penney Co.)*, 747 A.2d 430, 432 (Pa. Cmwlth.), *appeal denied*, 764 A.2d 1074 (Pa. 2000). An employer may satisfy this burden by presenting unequivocal and competent medical evidence of the claimant's full recovery from his work-related injuries. *Koszowski v. Workmen's Comp. Appeal Bd. (Greyhound Lines, Inc.)*, 595 A.2d 697, 699 (Pa. Cmwlth. 1991). "The question of whether expert medical testimony is unequivocal[] and, thus, competent evidence to support factual determinations[,] is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012). "In such cases, we review the testimony as a whole and may not base our analysis on a few words taken out of context." *Id.* "Taking a medical expert's testimony as a whole, it will be found to

20

be equivocal if it is based only upon possibilities, is vague, and leaves doubt." *Kurtz v. Workers' Comp. Appeal Bd. (Waynesburg Coll.)*, 794 A.2d 443, 449 (Pa. Cmwlth. 2002). To be competent, a medical expert's testimony must reflect the expert's adequate understanding of the facts. *Sears, Roebuck & Co. v. Workmen's Comp. Appeal Bd.*, 409 A.2d 486, 490 (Pa. Cmwlth. 1979). A medical expert's opinion will be held to be incompetent only when the opinion is based solely on inaccurate or false information; when the record as a whole contains factual support for an expert's opinion, the opinion is not incompetent. *Am. Contracting Enters., Inc. v. Workers' Comp. Appeal Bd. (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001).

Here, Employer contends that the testimony offered by Dr. Tinker and Dr. Heckert is incompetent because it is based on a misunderstanding of fact—*i.e.*, "that there was absolutely no support system or any security guards present" in the building at which Claimant worked. (Employer's Brief at 45.) We disagree, because even if we were to assume that Dr. Tinker and Dr. Heckert incorrectly believed that there were no security guards present in the building at all, their testimony relative to Claimant's inability to return to work in his pre-injury position is not incompetent given the facts and circumstances of this case. Claimant credibly testified that his concern with returning to his pre-injury position with Employer was not that Employer had no security guards in the building whatsoever but, rather, that the limited security guards available were insufficient and/or were unable to assist Claimant in maintaining the security of his classroom and the safety of himself and his students. (*See* R.R. Vol. II at 310a.) Claimant's testimony in this regard was corroborated by the credible testimony of Marino, who explained that a teacher's ability to utilize the security guards present in the building was severely limited because some of the communication systems used to contact the security guards

21

were inoperable, the security guards often would fail to respond to a teacher's request for assistance, and there were not enough security guards in the building to provide sufficient assistance in the classrooms. (*See id.* at 195a-200a.) As a result, Marino insisted that the burden primarily fell on the teachers to maintain the security of their classrooms and even the hallway outside their classrooms. (*See id*.) Dr. Heckert and Dr. Tinker based their opinions relative to Claimant's inability to return to work in his pre-injury position with Employer on the teaching environment described to them by Claimant, as corroborated by Marino. (*See* R.R. at 155a-57a, 234a-38a.) Thus, Dr. Tinker's and Dr. Heckert's opinions are not based solely on inaccurate or false information. *See Am. Contracting Enters., Inc.*, 789 A.2d at 396. In other words, the record as a whole contains factual support for Dr. Tinker's and Dr. Heckert's opinions relative to Claimant's inability to return to his pre-injury position with Employer because, based upon the credible testimony of both Claimant and Marino, any security guards present in the building would not necessarily have been available to assist Claimant with ensuring the safety of himself and his students in his classroom. *See id.*

Employer further contends that Dr. Heckert's testimony is incompetent because it was based upon an incorrect assumption that Claimant's sleep disturbances started after the October 26, 2015 work-related incident. Employer argues that "[t]his factor is critical" because "Dr. Heckert opined [that] the cognitive impairments affecting [Claimant's] ability to return to his [pre-injury] job . . . were caused primarily by pain and sleep disturbances." (Employer's Br. at 46.) Along these same lines, Employer suggests that Dr. Tinker's and Dr. Heckert's testimony is equivocal because it is inconsistent in relation to the cause of Claimant's cognitive impairment—*i.e.*, both Dr. Tinker and Dr. Heckert admitted that Claimant's

22

cognitive impairment is related to his chronic pain and sleep disturbances resulting from his non-work-related neck and shoulder conditions. Employer, however, has mischaracterized Dr. Heckert's and Dr. Tinker's testimony. While Dr. Heckert may have incredibly concluded that Claimant's chronic neck pain and disordered sleep were caused by the October 26, 2015 work-related incident, Dr. Heckert did not, as Employer contends, admit or even suggest that Claimant's chronic neck pain and sleep disturbances were the *source* of Claimant's current cognitive impairments. When questioned why Claimant had not yet recovered from his mild traumatic brain injury and post-concussive syndrome, Dr. Heckert explained that Claimant had several unresolved factors, including chronic pain and disturbed sleep, that were contributing to his post-concussive syndrome and delaying his recovery. In other words, Dr. Heckert did not attribute Claimant's cognitive impairment to his chronic neck pain or sleep disturbances but, rather, indicated that Claimant's mild traumatic brain injury and post-concussive syndrome with cognitive impairment remained unresolved due, in part, to those factors. (*See* R.R. at 262a-63a.) Similarly, Dr. Tinker admitted that Claimant's disordered sleep and chronic neck pain were "additional factors" inhibiting his ultimate recovery and his ability to return to work, but at no point did she submit that the disordered sleep and chronic neck pain were the source of Claimant's cognitive impairment. (*Id.* at 182a.) Accordingly, when considering their testimony as a whole, Dr. Tinker's and Dr. Heckert's testimony is not unreasonably vague or based upon possibilities and/or based solely on inaccurate or false information. *See Kurtz*, 794 A.2d at 449; *Am. Contracting Enters., Inc.*, 789 A.2d at 396.

For all of these reasons, we cannot conclude that Dr. Tinker's and Dr. Heckert's testimony relative to Claimant's inability to return to his pre-injury

23

position with Employer is equivocal or incompetent or that the WCJ's finding that Claimant has an ongoing work-related disability is not supported by substantial evidence.

### B. *Kachinski*

Employer contends that it met its required burden under *Kachinski* by establishing that there had been a change in Claimant's medical condition and that it had offered Claimant suitable employment. Employer, therefore, asserts that the burden shifted to Claimant to demonstrate a good faith attempt to follow through with Employer's job offer. Employer submits that Claimant's response in this regard was insincere and in bad faith, and, as a result, Claimant's benefits should have been suspended. Claimant counters that Employer did *not* meet its burden under *Kachinski*, because Employer did not offer Claimant a position that suits his physical capabilities. In this regard, Claimant contends that Employer's offer to discuss accommodations does not meet its obligation to affirmatively offer Claimant accommodations. Claimant, therefore, submits that Employer's failure to offer him a position with accommodations renders its job offers immaterial, because the WCJ concluded that Claimant could only return to his pre-injury position with accommodations.

An employer seeking to suspend or modify a claimant's benefits must demonstrate at the outset that the claimant's condition has changed such that he can work in some capacity. *Kachinski*, 532 A.2d at 380; *Valenta v. Workers' Comp. Appeal Bd. (Abington Manor Nursing Home & Rehab & Liberty Ins. Co.)*, 176 A.3d 374, 384 (Pa. Cmwlth. 2017), *appeal denied*, 186 A.3d 371 (Pa. 2018). Thereafter, under Section 306(b)(2) of the Act,[14] an employer must either:

---

[14] 77 P.S. § 512.

(1) offer to a claimant a specific job that it has available, which the claimant is capable of performing, or (2) establish "earning power" through expert opinion evidence including job listings with employment agencies, agencies of the Department of Labor and Industry, and advertisements in a claimant's usual area of employment.

*Edwards v. Workers' Comp. Appeal Bd. (MPW Indus. Servs., Inc.)*, 858 A.2d 648, 651 (Pa. Cmwlth. 2004) (quoting *S. Hills Health Sys. v. Workers' Comp. Appeal Bd. (Kiefer)*, 806 A.2d 962, 966 (Pa. Cmwlth. 2002)). When, as here, an employer seeks to suspend or modify a claimant's benefits based upon an offer of the claimant's pre-injury position, the procedure established by the Pennsylvania Supreme Court in *Kachinski* applies to determine whether a modification or suspension of the claimant's benefits is warranted.[15] Under that procedure, the employer must first establish an improvement in the claimant's medical condition, typically via medical evidence or expert testimony. *Kachinski*, 532 A.2d at 380. The employer then must produce evidence of a referral to a then open job that fits in the occupational category for which the claimant has been given medical clearance. Once this showing has been met, the burden shifts to the claimant to demonstrate a good faith attempt to secure employment, and if such attempt was unsuccessful, benefit payments would continue. *Id.*

---

[15] Following the Pennsylvania Supreme Court's decision in *Kachinski*, the General Assembly amended Section 306(b)(2) of the Act, allowing for an employer to obtain a modification of benefits based on evidence of earning power through expert testimony or by offering the claimant a different position with the employer. *See* Section 4 of the Act of June 24, 1996, P.L. 350 (Act 57). In other words, Act 57 lowered an employer's burden by no longer requiring the employer to offer a specific position and a claimant to obtain that position in order to modify the claimant's benefits. *See Riddle v. Workers' Comp. Appeal Bd. (Allegheny City Elec., Inc.)*, 981 A.2d 1288, 1292 n.8 (Pa. 2009); *Edwards*, 858 A.2d at 651. The Supreme Court has signaled, however, that *Kachinski* still applies in certain circumstances, where the injury took place before Act 57's enactment or where an employer seeks to modify benefits based on an offer of a specific job with the employer. *Riddle*, 981 A.2d at 1292 n.8; *see also S. Hills Health Sys.*, 806 A.2d at 967-68.

Here, Employer is seeking to suspend Claimant's benefits in connection with one of three separate job offer letters, wherein Employer offered Claimant his pre-injury position as a computer and business education teacher. The first two letters—dated May 19, 2016, and August 1, 2016—offered Claimant his pre-injury position based upon the results of Dr. McCarren's IME performed on March 9, 2016. At the time that Dr. McCarren performed his IME, Claimant's accepted work injury, as set forth in the NTCP, was a head contusion. Dr. McCarren opined that, based on the results of his IME, Claimant had fully recovered from his October 26, 2015 work-related injury—*i.e.*, the head contusion—and was not suffering from any cognitive or neurologic dysfunction as a result thereof. (*See* R.R. at 446a-47a, 455a, 474a.) In his decision, however, the WCJ determined that, in addition to a head contusion, Claimant also "sustained a mild traumatic brain injury and . . . post-concussion syndrome, with impaired cognitive performance," and he amended the NCP to encompass the augmented injury. (WCJ's Decision at 23.) Given that Dr. McCarren did not acknowledge the full extent of Claimant's accepted work-related injury—as modified by the WCJ's decision—the results of his IME are insufficient to sustain Employer's burden of establishing that it offered Claimant an available position that was within the occupational category for which Claimant had been given medical clearance. *See Kachinski*, 532 A.2d at 380. Consequently, the WCJ did not err by determining that, with respect to Employer's suspension and suspension/modification petitions seeking to suspend/modify Claimant's benefits effective May 19, 2016, or August 1, 2016, Employer failed to meet the requirements of *Kachinski*.

Employer's December 19, 2016 job offer letter, however, requires further discussion and consideration. In that letter, Employer again offered Claimant his

26

pre-injury position, but, this time, Employer based its job offer on the results of Dr. Tinker's neuropsychological evaluation performed on October 3, 2016. In her accompanying report, Dr. Tinker essentially opined that, as a result of the October 26, 2015 work-related injury, Claimant was suffering from post-concussive syndrome and impaired cognitive performance and that Claimant had not fully recovered from his work-related injury. (*See* Certified Record (C.R.) at Item No. 40, Exhibit 2.) Nowhere in her report did Dr. Tinker state that Claimant could return to work. Nevertheless, in its December 19, 2016 job offer letter, Employer asserted that Dr. Tinker suggested that Claimant was capable of returning to work with specific restrictions. (R.R. at 970a.) In support thereof, Employer quoted directly from Dr. Tinker's report: "[Claimant's] identified weaknesses are relatively subtle and will not limit his ability to succeed moving forward as long as he is provided appropriate support." (*Id*.) Employer, therefore, offered a meeting with Claimant to "discuss any reasonable accommodations [Claimant] may require in order for [him] to be successful in [his] position." (*Id*.)

Based upon our review of both Employer's December 19, 2016 job offer letter and the WCJ's decision, it is clear that the WCJ did not engage in a sufficient analysis of whether the December 19, 2016 job offer letter satisfied Employer's burden under *Kachinski*—*i.e.*, whether the December 19, 2016 job offer letter constituted a referral to a position that fits within the occupational category for which Claimant had been given medical clearance by Dr. Tinker. *See Kachinski*, 532 A.2d at 380. The WCJ determined:

> [E]mployer has failed to sustain its burden of proof to establish that as of March 9, 2016, or at any time thereafter at least through and including May 31, 2017, . . . [C]laimant was capable of returning to work in his pre-injury job or position as a teacher in the business

27

department at [Employer], *without some modifications to that job or position*.

(R.R. at 51a (emphasis added).) Essentially, the WCJ concluded that Claimant could return to work with certain modifications to his position; in other words, Employer met its burden of initially demonstrating an improvement in Claimant's medical condition that would permit him to return to work. *See Kachinski*, 532 A.2d at 380. The WCJ did not, however, consider whether Employer's December 19, 2016 job offer letter actually offered Claimant a position with accommodations. In other words, the WCJ stopped short of conducting a full *Kachinski* analysis, because he implicitly decided that Employer only offered Claimant his pre-injury position and he failed to consider: (1) whether Dr. Tinker had actually released Claimant to return to work in any capacity; and (2) if so, whether Employer's offer to meet with Claimant to discuss potential accommodations to his pre-injury position constitutes an offer of a job position for which Claimant had been given medical clearance. *See Kachinski*, 532 A.2d at 380. If the job offer was indeed sufficient to satisfy Employer's burden under *Kachinski*, the burden would have then shifted to Claimant to demonstrate that he acted in good faith in following through with Employer's job offer.

Accordingly, we must vacate the portion of the Board's order that affirmed the WCJ's denial of Employer's suspension/modification petition seeking to suspend/modify Claimant's benefits in connection with the December 19, 2016 job offer letter and remand to the Board with instructions to remand the matter to the WCJ for further consideration. On remand, the WCJ must adequately consider all of the issues surrounding Employer's suspension/modification petition, including, but not necessarily limited to: (1) whether Dr. Tinker's report was sufficient to support the issuance of the December 19, 2016 job offer letter—*i.e.*, whether, in her

28

report, Dr. Tinker actually released Claimant to return to work in some capacity, given that, at the time of her deposition, Dr. Tinker testified that Claimant was *not* able to return to work; (2) if so, whether Employer issued the December 19, 2016 job offer letter prematurely based on Employer's lack of understanding regarding what accommodations Claimant needed to return to his pre-injury position; (3) if not, whether Employer's offer to meet with Claimant to discuss potential accommodations to his pre-injury position constitutes an offer of a job position for which Claimant had been given medical clearance; and (4) if so, whether Claimant acted in good faith in response to Employer's December 19, 2016 job offer.

## C. Reasoned Decision

Employer argues that by crediting and accepting Claimant's medical evidence piecemeal, the WCJ's decision was internally inconsistent and, therefore, not reasoned under Section 422(a) of the Act. In support of this argument, Employer first notes that the WCJ concluded that Claimant's October 26, 2015 work-related injury did not include a new neck or shoulder injury or aggravations of his preexisting neck and shoulder conditions. Based on this conclusion, Employer takes issue with the WCJ's acceptance of Dr. Tinker's and Dr. Heckert's testimony as it concerns Claimant's cognitive impairment, because Employer alleges they both admitted that Claimant's chronic pain and sleep disturbances—which were brought on by Claimant's preexisting neck and shoulder conditions, not his mild traumatic brain injury and post-concussion syndrome—were the source of Claimant's current cognitive impairment. Employer, thus, submits that the WCJ's mismatched acceptance of Dr. Tinker's and Dr. Heckert's testimony does not cohere to his conclusions. Employer further argues that the WCJ's decision is also not reasoned because he failed to provide any discussion of or explanation for discrediting or

29

rejecting the legal pleadings that Claimant prepared in the civil action that he filed against Employer and the correspondence between Claimant and Magrowski, Mumin, and Celmer, which Employer contends illustrate Claimant's high-functioning cognitive abilities and his bad faith conduct concerning Employer's job offers.

Claimant limits his response to Employer's argument relative to the legal pleadings and written correspondence and first points out that Section 422(a) of the Act does not require the WCJ to discuss every detail of evidence in the record. Claimant, therefore, suggests that the WCJ did not need to discuss the legal pleadings and correspondence because there was no conflicting evidence to resolve. Rather, Claimant submits that Employer is attempting to pit irrelevant documents against competent medical testimony; in other words, Employer is attempting to establish, without the support of any credible medical expert, that, because Claimant was able to write articulate letters and legal pleadings, Claimant was capable of returning to his pre-injury position with Employer because he possessed the necessary cognitive function to teach in the teaching environment provided by Employer. In fact, Claimant points out that the legal pleadings were presented to both Dr. Heckert and Dr. Tinker during their depositions and both commented that Claimant's ability to prepare those legal pleadings following the October 26, 2015 work-related incident had no impact on their professional opinions of Claimant's cognitive abilities.

Section 422(a) of the Act provides, in pertinent part, that all parties in a workers' compensation case are "entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine

30

why and how a particular result was reached." The decision of a WCJ is "reasoned" if it allows for meaningful appellate review without further elucidation. *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003). In order to satisfy this standard, a WCJ does not need to discuss every piece of the evidence in the record. *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 194 n.4 (Pa. Cmwlth. 2006), *appeal denied*, 916 A.2d 635 (Pa. 2007). Rather, Section 422(a) of the Act requires WCJs to issue reasoned decisions so that this Court does not have to "imagine" the reasons why a WCJ finds that the testimony of one witness was more credible than the testimony of another witness. *Id.* at 196. Thus, "[w]hen faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence." Section 422(a) of the Act.

We have reviewed both the WCJ's decision and the evidentiary record and find no merit to Employer's contention that the WCJ's decision is not reasoned because it is internally inconsistent as it relates to the opinions of Dr. Heckert and Dr. Tinker. It is well settled that, as fact-finder, the WCJ is free to accept or reject testimony of medical witnesses in whole or in part. *See Lombardo v. Workers' Comp. Appeal Bd. (Topps Co., Inc.)*, 698 A.2d 1378, 1381 (Pa. Cmwlth. 1997), *appeal denied*, 718 A.2d 787 (Pa. 1998). This inherently includes crediting portions of a medical expert's testimony while simultaneously discrediting other parts of a medical expert's testimony. Here, the WCJ clearly and concisely explained his reasons for finding Dr. Tinker and Dr. Heckert credible as to the nature of Claimant's work-related head injury and Claimant's cognitive impairment. (*See* WCJ's Decision at 23, 25-26.) The WCJ also clearly and concisely explained his reasons for finding Dr. Heckert not credible as to her opinion that Claimant's neck or cervical

31

spine condition was caused by the October 26, 2015 work-related incident. (*See* WCJ's Decision at 23-25.)

Employer, nevertheless, suggests that the WCJ's decision is not reasoned because Dr. Tinker and Dr. Heckert admitted that Claimant's current cognitive impairment was caused by Claimant's chronic neck pain and sleep disturbances, both of which, by the WCJ's findings, are unrelated to the October 26, 2015 work-related injury. As we expressed in our substantial evidence analysis, however, Employer mischaracterizes the testimony of Dr. Heckert and Dr. Tinker. While they both admitted that Claimant's chronic pain was an additional, unresolved factor inhibiting Claimant's recovery, neither Dr. Tinker nor Dr. Heckert opined that Claimant's chronic neck pain was the *source* of Claimant's cognitive impairment. Rather, both Dr. Tinker and Dr. Heckert clearly submitted that Claimant's cognitive impairment was the result of the work-related injury. Accordingly, we cannot conclude the WCJ's decision was internally inconsistent as it relates to the opinions of Dr. Heckert and Dr. Tinker.

We also find no merit to Employer's argument that the WCJ's decision is not reasoned because he failed to explain his reasons for discrediting and/or rejecting the legal pleadings drafted by Claimant in the civil action that he filed against Employer. While Employer is correct that a reasoned decision requires explanation where conflicting testimony or evidence is discredited or rejected, it is also true that the WCJ "is only required to make the findings necessary to resolve the issues raised by the evidence and relevant to the decision," which does not require a discussion of every piece of evidence presented. *Dorsey*, 893 A.2d at 194 n.4. A detailed discussion of the legal pleadings was simply not necessary to resolve the issues of Claimant's ongoing work-related disability.

32

Employer suggests, however, that Claimant's "cognitive abilities of sustained attention and cognitive processing speed are evident in the content and reasoning expressed in the details of the [legal pleadings], [thus,] necessitating an opinion by the WCJ on their contents." (Employer's Br. at 49.) We disagree. The WCJ is not a medical expert. It is not within the WCJ's purview to review documents and determine whether, based upon the contents of those documents, Claimant possessed the necessary cognitive function to return to work for Employer. Those conclusions are left to the medical experts. It is the WCJ's job to review the testimony of those medical experts and to thereafter make credibility determinations and findings and/or conclusions based on their credible testimony. The WCJ credited the testimony of Dr. Tinker and Dr. Heckert relative to Claimant's ongoing cognitive impairments and inability to return to work. At the time of their depositions, both Dr. Tinker and Dr. Heckert were presented with at least a portion of the legal pleadings prepared by Claimant in his civil action against Employer. When questioned whether the content of those legal pleadings changed their opinions as to Claimant's cognitive impairment and ability to return to work in any way, both indicated that it did not. In fact, Dr. Heckert expressed that Claimant's ability to prepare legal pleadings would not have been greatly affected by the October 26, 2015 work-related incident, because Claimant would have been able to prepare those pleadings in a controlled environment where he would not have any distractions and could take breaks as needed. Given this credible expert medical testimony regarding the legal pleadings and their relationship to Claimant's cognitive ability, it was not necessary for the WCJ to credit or discredit the legal pleadings themselves to resolve the issues presented in this case.

33

Employer further avers that the correspondence between Claimant and Magrowski, Mumin, and Celmer relative to Employer's offers of employment was relevant to demonstrate Claimant's bad faith actions and, therefore, the WCJ was required to discuss the impact of and/or make credibility determinations relative to such letters for his decision to be reasoned under Section 422(a) of the Act. At the outset, we note that the WCJ did address the correspondence in his decision, stating that "[E]mployer also presented a considerable amount of . . . correspondence between . . . [C]laimant and officials or employees of [Employer] in support of its [p]etitions in this matter. That correspondence has been reviewed in its entirety." (WCJ's Decision at 10.) Thus, the WCJ did not deliberately ignore the correspondence. Based on our *Kachinski* analysis above, however, it is presently unclear whether the WCJ considered and discussed the correspondence in a sufficient manner pursuant to Section 422(a) of the Act. The correspondence would only become relevant to the WCJ's analysis if the WCJ determined that Employer's December 19, 2016 letter constituted a job offer such that the WCJ was required to consider the question of whether Claimant acted in good faith in response to the job offer. Thus, if the WCJ's analysis ultimately requires him to consider this issue, we would agree with Employer that the correspondence necessitated greater consideration by the WCJ, because the evidence demonstrates, in detail, over a period of months, exactly how Claimant responded to Employer's December 19, 2016 job offer, and why Claimant ultimately did not meet with Employer to discuss potential accommodations. If, however, in his analysis, the WCJ does not address the issue—either because he concludes that, in her report, Dr. Tinker did not release Claimant to return to work with accommodations or that Employer's offer to meet with Claimant to discuss potential accommodations to his

34

pre-injury position did not constitute an offer of a job position for which Claimant had been given medical clearance—a discussion of the correspondence would, like the legal pleadings, not be necessary to resolve the issues presented to the WCJ. Accordingly, we cannot, at this moment, determine whether the WCJ was required to discuss the correspondence between Claimant and Magrowski, Mumin, and Celmer relative to Employer's offers of employment for his decision to be reasoned under Section 422(a) of the Act.

For all of these reasons, we cannot conclude that the WCJ's decision was not reasoned as required by Section 422(a) of the Act.

### D. Capricious Disregard

Employer argues that the WCJ capriciously disregarded relevant evidence of record—*i.e.*, the legal pleadings drafted by Claimant in the civil action that he filed against Employer and the correspondence between Claimant and Magrowski, Mumin, and Celmer relative to Employer's offers of employment to Claimant. Employer contends that the legal pleadings are relevant to the issue of Claimant's ongoing disability because they "establish that [Claimant] had at least the requisite level of cognitive functioning to process and understand the complex legal theories involved in the civil litigation." (Employer's Br. at 49.) Employer further contends that the contents of the correspondence are relevant to the WCJ's analysis under *Kachinski*, because they display Claimant's bad faith response to Employer's job offers and they impact whether Employer was able to offer Claimant accommodations that would suit his medical capabilities. In response, Claimant argues that the legal pleadings and correspondence are irrelevant in the face of competent medical testimony establishing Claimant's ongoing cognitive impairment and, therefore, "[i]t is easy to see why [the] WCJ . . . did not spend a lot of time . . .

35

explaining why the [correspondence] and the legal pleadings were not relevant." (Claimant's Br. at 28.)

Capricious disregard occurs only when the WCJ ignores competent, relevant evidence. *Armitage v. Workers' Comp. Appeal Bd. (Gurtler Chems.)*, 842 A.2d 516, 519 n.4 (Pa. Cmwlth. 2004). A capricious disregard of evidence has been characterized as "a deliberate and baseless disregard of apparently reliable evidence." *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 814 (Pa. Cmwlth.), *appeal denied*, 887 A.2d 1243 (Pa. 2005). Thus, when determining whether the WCJ capriciously disregarded evidence, the Court must decide if the WCJ willfully or deliberately ignored evidence that any reasonable person would have considered to be important in reaching a result. *See Bennett v. Unemployment Comp. Bd. of Rev.*, 33 A.3d 133, 136 n.3 (Pa. Cmwlth. 2011) (quoting *Jackson v. Unemployment Comp. Bd. of Rev.*, 933 A.2d 155, 156 n.4 (Pa. Cmwlth. 2007)).

As it concerns the legal pleadings, we conclude that the WCJ did not capriciously disregard the evidence. As outlined in our reasoned decision analysis above, the legal pleadings were not relevant to Claimant's cognitive impairment. It is not within the WCJ's purview to review documents and determine whether, based upon the contents of those documents, Claimant possessed the necessary cognitive function to return to work for Employer, as the WCJ is not a medical expert. Rather, the WCJ appropriately credited and relied upon the expert medical testimony of Dr. Tinker and Dr. Heckert, both of whom testified that the legal pleadings had no impact on their opinions of Claimant's cognitive abilities. The legal pleadings are, therefore, not relevant in the face of this credible expert medical testimony, and there was no capricious disregard of the evidence by the WCJ. *See Armitage*, 842 A.2d at 519 n.4. Regarding the correspondence, however, we again conclude that it is

36

presently unclear whether the correspondence necessitated greater consideration and discussion in the WCJ's decision. As we explained more fully in our reasoned decision analysis above, the correspondence would only become relevant to the WCJ's analysis if he reaches the question of whether Claimant acted in good faith in response to Employer's December 19, 2016 job offer—*i.e.*, the WCJ determines that Employer met its burden under *Kachinski* such that the burden shifted to Claimant to demonstrate a good faith attempt at following through on Employer's job offer. *See Kachinski*, 532 A.2d at 380. In the event that the WCJ is required to consider this issue, the correspondence becomes relevant, as it demonstrates exactly how Claimant acted in response to Employer's December 19, 2016 job offer, and why Claimant ultimately did not meet with Employer to discuss accommodations. Accordingly, we cannot conclude that the WCJ capriciously disregarded competent, relevant evidence of record.

## IV. CONCLUSION

Accordingly, we vacate the Board's order, in part, and remand the matter to the Board with instructions to remand the matter to the WCJ for further proceedings consistent with this opinion. We affirm the Board's order in all other respects.

P. KEVIN BROBSON, Judge

37

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading School District and       :
PMA Management Corporation,     :
                 Petitioners   :
                           :
          v.           :   No. 269 C.D. 2020
                           :
Workers' Compensation Appeal  :
Board (Dismuke),          :
                 Respondent  :

# O R D E R

AND NOW, this 22nd day of October, 2021, the order of the Workers' Compensation Appeal Board (Board), dated February 12, 2020, is hereby AFFIRMED, in part, and VACATED, in part, and the matter is REMANDED to the Board for further proceedings consistent with this opinion.

Jurisdiction relinquished.

<br>

P. KEVIN BROBSON, Judge